UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X

SCOTT SCHNALL, P.E.,

Docket No. 1:17-cv-2412

Plaintiff,

-against-

**COMPLAINT**
*Jury Trial Demanded*

THE CITY OF NEW YORK, DEPARTMENT OF
BUILDINGS, RICK D. CHANDLER, in his capacity as
Commissioner of the Department of Buildings, ADAM
AARON ARCHITECT, P.C., and ADAM WAPNIAK,

Defendants.
---------------------------------------------------------------------- X

Plaintiff Scott Schnall, P.E., by his attorneys, Rosenberg & Estis, P.C., as and for his

complaint against defendants the City of New York (the "City"), acting by and through its

Department of Buildings (the "Department"), Rick D. Chandler (the "Commissioner" and,

together with the City and the Department, the "City Defendants"), Adam Wapniak ("Wapniak")

and Adam Aaron Architect P.C. ("Adam Aaron Architect" and, together with Wapniak, the

"Wapniak Defendants"), alleges upon knowledge as to his own actions, and upon information

and belief as to all other matters, as follows:

## NATURE OF THIS ACTION

1.      This case involves, *inter alia*, the City Defendants' unlawful retaliatory actions

and selective enforcement of the Department's regulations against Plaintiff for stating that the

Department is "screwed up" and criticizing the notorious delays and inefficiencies in the

Department's permit review and approval process as reported by the New York Times on

December 14, 2014 in an article entitled: "*Renovating? Don't Forget the Expediter*" (the "NY

Times Article").

2.      The City Defendants' actions violate 42 U.S.C. § 1983 and Plaintiff's rights under the First and Fourteenth Amendments of the United States Constitution.

3.      In retaliation for Plaintiff's widely-published criticisms of the Department, the City Defendants decided to, *inter alia*: (a) illegally target Plaintiff for selective enforcement of the Department's regulations and audit his jobs; (b) bring trumped-up charges and specifications against Plaintiff in an administrative enforcement proceeding for allegedly filing either knowingly or negligently false statements with the Department; (c) reject an administrative law judge's (the "ALJ") recommendation of a temporary penalty and, instead, permanently revoke Plaintiff's filing privileges with the Department, thus destroying Plaintiff's business and his ability to earn a living; and (d) issue at least 282 stop work orders to Plaintiff's clients on the false basis that an "imminent peril to life or property exists" without inspecting any of the properties to validly determine whether such "imminent peril" actually exists.

4.      In fact, within a few months of the publication of the NY Times Article, the City Defendants had completed its audit of Plaintiff, drafted a nineteen-page Petition, and filed it with the Office of Administrative Hearings and Trials ("OATH").

5.      After an administrative hearing at OATH, the ALJ dismissed nearly half of the Department's trumped-up specifications against Plaintiff.

6.      While the ALJ did sustain certain specifications (erroneously), the ALJ acknowledged that, although the City charged Plaintiff with eleven instances of knowingly making a false statement, eight of those instances were either entirely dismissed or sustained as negligent filings only.

7.      In a separate charge, the City alleged nine additional instances of negligent conduct against Plaintiff as a basis for seeking to revoke his filing privileges.  However, five of those instances were completely dismissed.

8.      As such, based on the limited specifications that were sustained, the ALJ recommended, among other things, *temporarily* revoking Plaintiff's filing privileges with the Department and allowing Plaintiff to seek reinstatement after one year with appropriate conditions (such as probation) (the "ALJ Recommendation").

9.      This simply was not punitive enough for the Department and the Commissioner, as they were determined to permanently ruin Plaintiff's life and his business due Plaintiff's statements about the Department's review and approval process being "screwed up" that were published in the NY Times Article.

10.     Accordingly, in further retaliation for Plaintiff's statements to the New York Times, the Commissioner refused to adopt the ALJ Recommendation (even though he purported to adopt the ALJ's factual findings).

11.     Instead, the Commissioner decided to impose a shockingly severe, unwarranted, and disproportionate penalty upon Plaintiff by permanently revoking Plaintiff's filing privileges with no opportunity for reinstatement (the "Draconian Determination").

12.     The Department and the Commissioner have not targeted and inflicted such severe and disproportionate penalties on professionals similarly situated to Plaintiff.

13.     The Draconian Determination destroys Plaintiff's business and ability to earn a living for his family because all of his business is derived from New York City – where Plaintiff has successfully worked his entire life.

RE\56766\0001\2144324v5

14.     Apparently unsatisfied with preventing Plaintiff from ever again working in New York City, the Commissioner arbitrarily extended the Draconian Determination to engulf Plaintiff's clients, similarly upending, disrupting, and irreparably injuring their lives and businesses.

15.     Indeed, as a means of further retaliating against Plaintiff due to his statements that appeared in the NY Times Article and to ensure that his business cannot survive, the Commissioner decided to make his Draconian Determination applicable not only to new filings by Plaintiff, but also to all of Plaintiff's previously approved jobs/applications (at least 282 in total) where work was in progress notwithstanding the fact that the jobs were entirely unrelated to any of the Department's charges against Plaintiff.

16.     To effectuate this additional punitive measure, the Department decided to recklessly issue at least 282 stop work orders and permit revocation notices to Plaintiff's clients pursuant to CITY ADMIN. CODE § 28-105.10.2 based on the alleged (but entirely fabricated) basis that the Commissioner has "determined" that an "imminent peril to life or property exists."

17.     In point of fact, neither the Department nor the Commissioner inspected any of the properties of Plaintiff's clients prior to issuing the 282 stop work orders and upending hundreds of lives and businesses throughout Brooklyn, causing irreparable harm to both Plaintiff and his clients.

18.     As noted, neither the Commissioner nor the Department made any allegation of an "imminent peril" during the period from June 2015 (when they filed the Petition) through February 2016 (when the Commissioner issued the Draconian Determination).

RE\56766\0001\2144324v5

19.     Having failed to conduct a single inspection, the Commissioner could not have validly "determined" that an "imminent peril to life or property exists."  Rather, this was yet another decision made by the City Defendants to retaliate against Plaintiff.

20.     On March 28, 2017, Plaintiff, together with several of his clients, as additional plaintiffs, commenced an action in State Court seeking, *inter alia*, review of the Draconian Determination and permanent injunctive relief with respect to the stop work orders and permit revocation notices.  See Schnall v. City of New York, (N.Y. Sup. Ct., Kings County, Index No. 506129/17) (the "State Court Action").

21.     Simultaneously, the plaintiffs in the State Court Action moved by order to show cause for a preliminary injunction against the City Defendants based upon the irreparable injury suffered by Plaintiff and his clients resulting from the Department's illegal, retaliatory, and reckless decision to issue 282 stop work orders and permit revocation notices to previously approved jobs for which there had been no showing of any "imminent peril."

22.     Supreme Court (Dear and Levine, JJ.) granted Plaintiff a temporary restraining order, requiring, among other things, the Department to rescind all 282 stop work orders and to allow all active and current permits to proceed with ongoing work.

23.     Plaintiff now brings this action pursuant to 42 U.S.C. § 1983 to redress the City Defendants' violations of his constitutional rights including his rights to freedom of speech and equal protection under the First and Fourteenth Amendments of the United States Constitution.

24.     Plaintiff also seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 annulling CITY ADMIN. CODE § 28-105.10.2 because the provision's unconstitutional vagueness and overbreadth enabled the City Defendants to retaliate against him and violate his rights under the First and Fourteenth Amendments.

RE\56766\0001\2144324v5

25.   This case also involves the Wapniak Defendants' tortious interference with Plaintiff's contracts and business relationships with Plaintiff's clients.

26.   Wapniak testified against Plaintiff during the OATH hearing.

27.   Plaintiff would later learn that Wapniak's testimony was tainted and motivated by his desire to steal hundreds of Plaintiff's clients whose construction projects were shut down by the stop work orders.

28.   Indeed, shortly after the Commissioner issued the Draconian Determination, Wapniak and his company, Adam Aaron Architect, sought to capitalize on his position and the knowledge he obtained as the Department's Queens County Borough Commissioner to intentionally interfere with the contracts and business relationships between Plaintiff and his clients by offering to step in as the professional of record and get the projects moving again – for a fee, of course.

## THE PARTIES

29.   Plaintiff is a natural person domiciled in Kings County, New York.  Plaintiff also has a business address located in Kings County, New York.

30.   For over 27 years and at all relevant times, Plaintiff, a professional engineer, has helped low and middle income New Yorkers navigate the increasingly complex permit application and approval process of the Department.

31.   The City is a domestic municipal corporation duly organized under the laws of the State of New York, acting by and through the Department.

32.   The Commissioner is a natural person and, at all relevant times, the Commissioner of the Department.

- 6 -

33.     Wapniak is a natural person domiciled in Kings County, New York.  Wapniak is also a former Queens County Borough Commissioner of the Department and is currently President of Adam Aaron Architect.

34.     Defendant Adam Aaron Architect P.C. ("Adam Aaron Architect" and, together with Wapniak, the "Wapniak Defendants") is a New York professional corporation created on May 13, 2008, having offices c/o Adam Wapniak 800 Greenwood Avenue, 1G, Brooklyn, New York 11218.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 2201 and 42 U.S.C. § 1983.

36.     Venue lies in this District pursuant to 28 U.S.C. § 1391.  A substantial part of the events giving rise to this action occurred in this District.

## BACKGROUND FACTS

37.     For more than 80 years, the Schnall family business (which Plaintiff's grandfather started) has helped thousands of families, business, owners, and developers navigate the Department's maze of rules and to obtain permits and approvals for both residential and commercial projects in New York City.

38.     Plaintiff is a widely-respected fixture in the New York real estate world, personally filing thousands of applications with the Department and obtaining thousands of approvals during his 27-year career as a professional engineer.

39.     The majority of Plaintiff's clients are low and middle income people who rely on Plaintiff's honest advice and cost-effective services to complete their projects.

40.     Plaintiff has run his business with integrity and respect for the Department's rules and processes.

41.     The Department had never (until the NY Times Article was published) charged Plaintiff with violating any rules or regulations during his 27-year career.

## AS AND FOR A FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983 – First Amendment Retaliation)

42.     Plaintiff repeats all prior statements.

43.     In July 2014, the Commissioner was appointed to the Department.

44.     Later that year, in December 2014, Joanne Kaufman, a New York Times reporter, asked Plaintiff to comment for her story about the Department and the role of expediters.

45.     Plaintiff agreed to the interview and shared his experiences and honest opinions about the Department with Ms. Kaufman.

46.     The New York Times published the article on December 14, 2014, including a color photograph of Plaintiff and his following quote about the Department's review process:

> You go back and forth and back and forth.  That
> could take one day or one million days.  It's true.
> The whole system is much more screwed up than
> you could ever imagine.

47.     Plaintiff was also quoted in the article as stating:

> My expediters can get to the D.O.B. at 5:30 a.m.
> and leave at 2[:00] p.m. with nothing done.  In the
> real world when you have 20 things to do and you
> get them done, that's success.  In this world, when
> you get two things done you get excited.

48.     Plaintiff's knowledge, expertise, longevity, and reputation for honesty are the reasons that the New York Times sought his insight and published his comments about the Department.

49.     Plaintiff's comments also rang true across the New York real estate world, which widely agrees that the Department's permit review and approval process is cumbersome and inefficient.

- 8 -

50.     Because of the foregoing, Plaintiff's comments struck a nerve at the Department and drew the ire of the newly-appointed Commissioner.

51.     The Commissioner and the Department perceived Plaintiff's statements in the NY Times Article as damaging to the Department's image and sought to punish him.

52.     The Commissioner was so concerned about Plaintiff's comments and the damage to the Department's image that he gave his own interview to the New York Times in March 2015.

53.     The Commissioner, fresh into his tenure, also sought to make a name for himself, burnish his credentials, and unfairly make an example of Plaintiff.

54.     Thus, as a result of the NY Times Article, the Commissioner and the Department decided to retaliate by targeting Plaintiff for selective enforcement of the Department's rules and regulations and auditing Plaintiff's open jobs and applications in a scope and in an amount that were unprecedented in Plaintiff's 27-year career.

55.     Shortly after the NY Times Article was published, Plaintiff started receiving letters from the Department notifying him of the audits, listing alleged objections with the applications, and demanding that Plaintiff meet with the Department's auditors to address the alleged objections.

56.     Also shortly after publication of the NY Times Article, Plaintiff's clients and employees began hearing rumors that the Department decided to target Plaintiff.

57.     Over the next couple of months, Plaintiff received approximately ten to fifteen audit notices from the Department in retaliation for his statements in the NY Times Article.

58.     The Department audited Plaintiff's permit applications as if they were "self-certified" by Plaintiff, even though virtually all of the applications were not "self-certified."

- 9 -

59.     Rather, the Department had previously reviewed and approved all but one of the audited applications.

60.     During Plaintiff's 27-year career, this was the first time that the Department subjected Plaintiff to these types of audits in rapid succession and the NY Times Article was a substantial and/or motivating factor in its decision to do so.

61.     Plaintiff cooperated with the Department's audits by, among other things, preparing audit amendments and paying additional fees to the Department.

62.      Despite the foregoing, the Department's audit division warned Plaintiff to either surrender his filing privileges or the Department would strip him of his privileges at an OATH hearing.

63.     Even before the Department filed its trumped-up charges against Plaintiff, before issuance of the ALJ's Recommendation, and before issuance of the Draconian Determination, the Department's examiners began telling Plaintiff's clients to distance themselves from Plaintiff and/or to fire Plaintiff because, according to the plan examiners, the Department had decided to strip Plaintiff of his filing privileges and because Plaintiff would allegedly be losing his State-issued engineering license.

64.     In June 2015, in retaliation for Plaintiff's comments in the NY Times Article, the Department filed a Petition with OATH alleging that Plaintiff had: (a) knowingly or negligently made false statements in violation of CITY ADMIN. CODE § 28-105.10.2 ("Charge 1");[1] (b) displayed negligence or incompetence in violation of RCNY § 21-02 ("Charge 2"); and knowingly or negligently made false statements in violation of RCNY § 21-02.

_____

[1]     Plaintiff's third cause of action, *infra*, seeks a declaratory judgment annulling CITY ADMIN. CODE § 28-105.10.2 as unconstitutionally vague and overbroad.

65.     The Department amended its petition on the eve of the May 2016 OATH hearing by dropping the third charge and alleging eleven specifications under Charge 1 and nine specifications under Charge 2 relating to applications that Plaintiff submitted to the Department between 2010 and 2014.

66.     The Department presented Wapniak and Fatima Murillo as its only witnesses at the OATH hearing.

67.     At no time after auditing Plaintiff's applications, filing its Petition, or during the more than six months following the hearing while awaiting a decision did the Department allege that an "imminent peril to life or property exist[ed]" with respect to the applications cited in its Petition.

68.     Nor did the Department allege that such "imminent peril" existed with respect to Plaintiff's hundreds of other applications for which the City Defendants would later issue stop work orders and permit revocation notices without any legal basis and solely to further retaliate against Plaintiff for his statements in the NY Times Article.

69.     Six months after the hearing ended, the ALJ eventually issued a Report and Recommendation, dated February 10, 2017, determining, among other things, that the Department failed to prove nine of its twenty alleged specifications and dismissed those nine specifications.

70.     In addition, the ALJ found that the Department had failed to prove eight of the specifications alleging that Plaintiff made a knowingly false statement.  Instead, the ALJ either dismissed those specifications or sustained them as negligent conduct only, thus demonstrating that the Department's charges against Plaintiff were baseless and trumped-up and that the Department's decision to selectively target Plaintiff was retaliatory in nature.

71.     In addition, out of the nine additional charges of negligent conduct alleged by the Department, more than half were dismissed by the ALJ, thus further demonstrating that the Department selectively decided to bring trumped-up charges against Plaintiff (many of which have been dismissed) to retaliate against Plaintiff for his statements in the NY Times Article.

72.     The three sustained specifications for alleged knowing statements to the Department related to Plaintiff withdrawing and refiling three applications, a widely-used practice that the Department has never prohibited and has never promulgated a rule or regulation prohibiting.

73.     In fact, with only one exception, the applications that Plaintiff subsequently refiled were approved by the Department's own plan examiners.

74.     Many similarly situated professionals refile applications seeking an approval from the Department in the same manner as Plaintiff.

75.     The Department has tacitly accepted this practice by never expressly prohibiting professionals from refiling applications by rule, regulation, or otherwise.

76.     Based on the limited specifications that were sustained, which primarily consisted of alleged negligence, the ALJ recommended, among other things, temporarily revoking Plaintiff's filing privileges with the Department and allowing Plaintiff "the opportunity to seek reinstatement of those privileges after a year upon the imposition of appropriate conditions, such as probation."[2]

77.     Although the foregoing penalty was already disproportionate to the sustained charges, the Commissioner decided that the penalty was not punitive enough and was determined

_____

[2]     As described in the Third and Fourth Causes of Action, *infra*, Wapniak (who testified against Plaintiff at the OATH hearing) subsequently abused his position at the Department and role at the OATH hearing in an intentional and malicious attempt to steal Plaintiff's clients, tainting the veracity of Wapniak's testimony at the hearing.

to destroy Plaintiff's business and ensure that he would unable to earn a living for criticizing the Department in the NY Times Article.

78.     Accordingly, in further retaliation for Plaintiff's statements to the New York Times, the Commissioner imposed a shockingly severe, unwarranted, and extremely disproportionate penalty on Plaintiff by permanently revoking Plaintiff's filing privileges with no opportunity for reinstatement (the "Draconian Determination").

79.     The Commissioner's Draconian Determination destroys Plaintiff's business and his ability to earn a living for his family.

80.     Apparently unsatisfied with the foregoing, the Commissioner extended his Draconian Determination to all of Plaintiff's previously-approved, in-progress jobs, even though the jobs were entirely unrelated to any of the Department's charges against Plaintiff to further retaliate against Plaintiff for his statements in the NY Times Article.

81.     Specifically, based on the Commissioner's retaliatory decision, the Department decided to recklessly issue at least 282 stop work orders and permit revocation notices to Plaintiff's clients pursuant to CITY ADMIN. CODE § 28-105.10.2 based on the false basis that the Commissioner has "determined" that an "imminent peril to life or property exist[ed]" at the clients' properties.

82.     Neither the Department nor the Commissioner, however, inspected any of the properties of Plaintiff's clients before issuing the 282 stop work orders and upending hundreds of lives and businesses throughout Brooklyn, causing irreparable harm to Plaintiff and his clients.

83.     Having failed to conduct a single inspection of the properties, the Commissioner could not have validly "determined" anything about the properties, let alone that an "imminent peril to life or property exists."

- 13 -

84.     Rather, this was yet another decision to retaliate against Plaintiff for his statements in the NY Times Article.

85.     At the same time, the Department issued permit revocation notices to Plaintiff's clients stating that: "These actions are the result of the Department revoking the filing privileges of Scott Schnall, P.E. . . ."; thus, the notices contradict the Department's claim in the stop work orders that the Commissioner had determined that an "imminent peril" existed.

86.     As set forth in more than fifty Irreparable Injury Affidavits submitted in the State Court Action (see Schnall v. City of New York, [N.Y. Sup. Ct., Kings County, Index No. 506129/17] [NYSCEF Doc. No. 4]), the Department's actions inflicted broad and severe harm to innocent people and businesses throughout Brooklyn, including the following harmful consequences, among others:

    a.   families are unable to move into their homes, upending their children's lives and schooling;

    b.   much needed affordable housing is being kept off of the market; building and homes are without heat;

    c.   "time-of-the-essence" closings are in default and contract deposits are being forfeited;

    d.   deadlines for 1031 exchanges are in peril; and

    e.   bars/restaurants, art galleries and other small businesses are unable to open, unable to pay rent and unable to keep their employees, leading to landlords not getting paid and not being able to make mortgage and financing payments.

- 14 -

87.     The Department intentionally, knowingly, and recklessly caused the foregoing irreparable injuries to retaliate against Plaintiff for the NY Times Article and to turn his clients against him, further ensuring that Plaintiff's business would be unable to survive.

88.     On March 28, 2017, Plaintiff and several of his clients commenced the State Court Action and simultaneously moved by order to show cause for a preliminary injunction.

89.     That same day, Supreme Court (Dear, J.) issued a temporary restraining order that, among other things: (a) enjoined the City Defendants from enforcing the Draconian Determination; (b) required the City Defendants to rescind all stop work orders issued as a result of the Draconian Determination and to reinstate the revoked permits; and (c) allowed Plaintiff to file documents with respect to jobs in progress to "close-out" the jobs.

90.     Supreme Court (Levine, J.) continued the temporary restraining order by, among other things: (a) requiring the Department to rescind the stop work orders; (b) allowing all active and current permits to proceed with ongoing work; and (c) creating a mechanism to "close-out" completed jobs.[3]

91.     By criticizing the Department in comments to the New York Times, Plaintiff engaged in conduct protected by the First Amendment.

92.     Acting under the color of law, the City Defendants retaliated against Plaintiff for his comments in the NY Times Article.

93.     Plaintiff's statements to the New York Times were the substantial and/or motivating factor in at least seven adverse decisions taken by the City Defendants against Plaintiff, to wit:

_____

[3]     Judge Dear was the signing judge for Plaintiff's application for a temporary restraining order.  The State Court Action is currently assigned to Judge Levine.

a. The City Defendants' decision to target Plaintiff, audit his applications, and treat the applications as "self-certified";

b. The City Defendants' decision to bring trumped-up charges and selectively enforce the Department's rules and regulations against Plaintiff, some of which have never been promulgated by the Department as required by the City Administrative Procedure Act;

c. The Commissioner's decision to reject the ALJ Recommendation and to impose the Draconian Determination instead;

d. The Commissioner's decision to apply the Draconian Determination to all of Plaintiff's open jobs;

e. The Commissioner's decision to issue 282 stop work orders to Plaintiff's clients, without inspecting any of the properties to validly determine whether an actual "imminent peril to life or property exists" at the properties;

f. The Commissioner's decision to issue permit revocation notices to all of Plaintiff's clients; and

g. The City Defendants' decision to issue violation notices to Plaintiff's clients that state that Plaintiff's State-issued license has been revoked, which is false and defamatory and intended to harm Plaintiff (collectively, the "Retaliatory Decisions").

94.    The City Defendants' Retaliatory Decisions were designed to destroy Plaintiff's business and to serve as a warning to others who dared to criticize the Department, chilling free speech.

- 16 -

95.     The Retaliatory Decisions caused Plaintiff significant harm by destroying his business, reputation, and ability to earn a living for him and his family.

96.     The Retaliatory Decisions were made with deliberate indifference to Plaintiff's First Amendment rights.

97.     The Retaliatory Decisions effectively chilled the exercise of free speech by Plaintiff and others.

98.     In fact, former Borough Commissioners, injured third parties, and professionals that practice before the Department have already declined to speak on the record in fear of the Department's retaliation.

99.     Based on the foregoing, Plaintiff has been damaged and is entitled to a money judgment against the City Defendants in an amount that is currently unknown, but believed to exceed $10,000,000.00 plus costs and attorneys' fees, the full amount of which shall be established at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – Equal Protection)

100.    Plaintiff repeats all prior statements.

101.    Professionals similarly situated to Plaintiff routinely engage in refiling of applications with the Department.

102.    Upon information and belief, Defendants did not target such similarly situated professionals for Retaliatory Decisions.

103.    Professionals similarly situated to Plaintiff have violated the same regulations that Plaintiff allegedly violated.

104.    The Commissioner neither permanently barred such similarly situated professionals from filing applications with the Department nor punitively extended penalties to the in-progress jobs of these professionals' clients.

105.    The Commissioner has personally agreed to stipulations of settlement imposing far lighter penalties for conduct far worse than the conduct that the Department alleged against Plaintiff.

106.    The Department has only barred filing privileges in rare cases, including in cases where the professional committed outright fraud against the Department (which is not the case here).

107.    Acting under the color of law, the City Defendants arbitrarily targeted Plaintiff for selective enforcement of the building laws and regulations and for refiling applications (which the Department does not expressly prohibit).

108.    The City Defendants' selective treatment of Plaintiff was knowing and either irrational or motivated by animus toward Plaintiff.

109.    The City Defendants discriminated against Plaintiff on the basis of impermissible considerations, such as to retaliate against him for his comments in the NY Times Article, or by a bad-faith intent to injure him.

110.    The City Defendants' actions violated Plaintiff's constitutional rights, including his rights under the First and Fourteenth Amendments.

111.    The City Defendants' actions caused Plaintiff significant injuries, including permanently damaging his reputation and business and destroying his ability to earn a living.

- 18 -

112.   Based on the foregoing, Plaintiff has been damaged and is entitled to a judgment against the City Defendants in an amount that is currently unknown, but believed to exceed $10,000,000.00 plus costs and fees, the full amount of which shall be established at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Declaratory Judgment – CITY ADMIN. CODE § 28-211.1.2)

113.   Plaintiff repeats all prior statements.

114.   The Commissioner and the Department relied on CITY ADMIN. CODE § 28-211.1.2 to retaliate against Plaintiff for his statements in the NY Times Article.

115.   CITY ADMIN. CODE § 28-211.1.2 provides, as relevant here:

> [T]he commissioner may refuse to accept an application or other document submitted pursuant to or in satisfaction of a requirement of this code or of a rule of any agency promulgated thereunder that bears the signature of a person who has been found, after a hearing at the office of administrative trials and hearings . . . to have knowingly or negligently made a false statement . . . .

116.   CITY ADMIN. CODE § 28-211.1.2 is unconstitutional on its face and as applied to Plaintiff under the First, Fifth, and Fourteenth Amendments of the United States Constitution.

117.   CITY ADMIN. CODE § 28-211.1.2 is fatally vague and overbroad and failed to provide Plaintiff with a reasonable opportunity to know what is prohibited.

118.   CITY ADMIN. CODE § 28-211.1.2 also enables and encourages the City Defendants' arbitrary, discriminatory, and retaliatory enforcement of the provision on an ad hoc basis.

119.   Specifically, allowing the City Defendants to retaliate against "negligently made false statement[s]" allows them to target, charge, and punish any professional that practices before the Department (like Plaintiff), restrained only by their own discretion – for example and

without limitation, the code provision fails to include a definition of "false" or a materiality requirement.

120.    As applied by the Commissioner and the Department, a "false" statement is simply any statement that the Department later determines is incorrect, and authorizes the Commissioner to permanently revoke a professional's filing privileges even if the statement was immaterial, inconsequential, or accidental.

121.    When professionals like Plaintiff submit applications to the Department, they are interpreting the Zoning Resolution and/or Building Code which (like all areas of the law) are often ambiguous, unsusceptible to bright-line rules, and subject to multiple interpretations.

122.    What the City Defendants may consider to be a "false" statement in many instances is merely a disagreement over subjective legal interpretations – even among the Department's employees, ten plan examiners could give ten different interpretations and answers.

123.    Thus, professionals like Plaintiff are left guessing whether the Department will approve or object to their applications; these systemic and structural realities forced professionals to refile applications, which, as noted, the Department has never prohibited by rule, regulation, or otherwise.

124.    In addition, the Commissioner and the Department can always (as they did here) audit a professional's applications and find "false" statements because virtually all audits will uncover objections – *i.e.*, statements that the Department disagrees with or has a different interpretation of law or code even if previously approved by a plan examiner – in the applications.

125.   It is also fatally unclear how a negligently-made statement could simultaneously be "false" because the "false" implies an intent to deceive, not mere carelessness.

126.   As demonstrated by this case, the City Defendants can use CITY ADMIN. CODE § 28-211.1.2 to punish expression protected by the First Amendment.

127.   Here, City Defendants decided to retaliate against Plaintiff for his statements in the NY Times Article.

128.   The Department's retaliatory audits discovered that Plaintiff allegedly refiled applications with the Department (which the Department subsequently approved), a practice that the Department had never expressly prohibited by rule, regulation, or otherwise.

129.   CITY ADMIN. CODE § 28-211.1.2's vagueness and overbreadth, however, enabled the City Defendants to retaliate against Plaintiff for his statements in the New York Times by classifying his actions as "false" statements.

130.   In addition, the City Defendants abused CITY ADMIN. CODE § 28-211.1.2 to retaliate against Plaintiff because the Department's audits were virtually guaranteed to lead to objections that the City Defendants could claim were "false" statements.

131.   In fact, under CITY ADMIN. CODE § 28-211.1.2, a professional's single, immaterial, and negligent "false" statement allows the Commissioner to permanently revoke the professional's filing privileges and destroy his or her livelihood.

132.   Thus, CITY ADMIN. CODE § 28-211.1.2 permits the City Defendants to strip any professional of his or her filing privileges by simply targeting the professional's applications for audits and charges because every audit will yield objections (*i.e.*, "false" statements).

133.   The sole impediment is the Commissioner's and the Department's unchecked discretion to target and audit the professional's applications and to issue the charges.

134.    As a result, Plaintiff has suffered injuries including violations of his rights under the First, Fifth, and Fourteenth Amendments.

135.    The City Defendants dispute that CITY ADMIN. CODE § 28-211.1.2 is unconstitutionally vague and overbroad.

136.    Thus, an actual and substantial controversy exists between the parties.

137.    A judicial determination of the rights and obligations of the parties is necessary to resolve the actual and substantial controversy.

138.    Plaintiff lacks an adequate legal remedy.

139.    Plaintiff are entitled to a judgment declaring that CITY ADMIN. CODE § 28-211.1.2 is unconstitutionally vague and overbroad, and void on its face and as applied to Plaintiff and that all enforcement proceedings based on CITY ADMIN. CODE § 28-211.1.2 taken against Plaintiff and all other professionals are null and void and of no further force or effect.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Tortious Interference with Contracts)

140.    Plaintiff repeats all prior statements.

141.    Just weeks after the Draconian Determination and the Department issued the stop work orders to Plaintiff's clients, Wapniak (who testified against Plaintiff at the OATH hearing) attempted to steal Plaintiff's clients and further harm Plaintiff.

142.    Specifically, Wapniak sent unsolicited emails to Plaintiff's clients referencing the "revocation of the filing privileges of the professional engineer of record" (*i.e.*, Plaintiff) and offering to provide services to complete the jobs.

143.    Plaintiff and his clients are, at all relevant times, parties to contracts (the "Client Contracts").

- 22 -

144.    The Wapniak Defendants were aware of the Client Contracts through Wapniak's position at the Department and role at the OATH hearing, in which Wapniak testified against Plaintiff.

145.    Just weeks after the Draconian Determination, the Wapniak Defendants intentionally and maliciously induced Plaintiff's clients to breach the Client Contracts by sending unsolicited emails to the clients in an attempt to steal the clients' business from Plaintiff.

146.    Wapniak sought to personally profit from his position at the Department and role in the OATH hearing, using his knowledge obtained at the hearing to steal Plaintiff's clients for the Wapniak Defendants and cause Plaintiff's clients to breach their contracts and agreements with Plaintiff.

147.    The Wapniak Defendants' actions were intentionally and maliciously calculated to interfere with the Client Contracts and to profit at Plaintiff's expense.

148.    Based on the foregoing, Plaintiff has been damaged and is entitled to a money judgment against the Wapniak Defendants in an amount that is currently unknown, but believed to exceed $500,000.00 and, in addition, Plaintiff is entitled to punitive damages believed to exceed $1,500,000.00, the full amount of which shall be established at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Tortious Interference with Business Relations)**

149.    Plaintiff repeats all prior statements.

150.    Plaintiff had business relationships with the clients that the Wapniak Defendants targeted with the unsolicited emails.

151.    The Wapniak Defendants were aware of Plaintiff's business relationships with his clients through Wapniak's position at the Department and personal involvement in Defendants' actions against Plaintiff, including testifying against Plaintiff at the OATH hearing.

- 23 -

152.    The Wapniak Defendants' actions were intentionally and maliciously calculated to interfere with Plaintiff's business relationships with his clients.

153.    The Wapniak Defendants' acted by wrongful means by abusing Wapniak's role at the Department and the OATH hearing in using information obtained during the hearing to maliciously interfere with Plaintiff's business relationships for the sole purpose of inflicting intentional harm on Plaintiff.

154.    The Wapniak Defendants' actions caused significant damage to Plaintiff's business relationships with his clients.

155.    Based on the foregoing, Plaintiff has been damaged and is entitled to a money judgment against the Wapniak Defendants in an amount that is currently unknown, but believed to exceed $500,000.00 and, in addition, Plaintiff is entitled to punitive damages believed to exceed $1,500,000.00, the full amount of which shall be established at trial.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the City Defendants and the Wapniak Defendants as follows:

i       On his first cause of action, a money judgment against the City Defendants in an amount that is currently unknown, but believed to exceed $10,000,000.00 plus costs and attorneys' fees, the full amount of which shall be established at trial;

ii      On his second cause of action, a money judgment against the City Defendants in an amount that is currently unknown, but believed to exceed $10,000,000.00 plus costs and attorneys' fees, the full amount of which shall be established at trial;

iii     On his third cause of action, a judgment declaring that CITY ADMIN. CODE § 28-105.10.2 is unconstitutionally vague and overbroad, and void on its face and as applied to Plaintiff, and that all enforcement proceedings based upon CITY ADMIN. CODE § 28-211.1.2 taken against Plaintiff and all other professionals are null and void and of no further force or effect;

iv      On his fourth cause of action, a money judgment against the Wapniak Defendants in an amount that is currently unknown, but believed to exceed

RE\56766\0001\2144324v5

$500,000.00 and, in addition, Plaintiff is entitled to punitive damages believed to exceed $1,500,000.00;

v       On his fifth cause of action, a money judgment against the Wapniak Defendants in an amount that is currently unknown, but believed to exceed $500,000.00 and, in addition, Plaintiff is entitled to punitive damages believed to exceed $1,500,000.00; and

vi      Granting to Plaintiff such other and further relief against the City Defendants and the Wapniak Defendants as the Court deems just and proper.

Dated:   New York, New York
         April 21, 2017

**ROSENBERG & ESTIS, P.C.**
*Attorneys for Plaintiff*

By:
         Brett B. Theis
         733 Third Avenue
         New York, New York 10017
         (212) 867-6000

( BT 0070 )

- 25 -